Jaycox, J.:
The city of New York, for the purpose of supplying its citizens with pure and wholesome water, acquired the lands in the town of North Salem which are the subject of this controversy. These lands, although assessed as three distinct parcels, are contiguous and form but one parcel, containing over 1,400 acres. Some of the lands are flooded by the Croton dam, some are flooded by the Titicus dam and some are apparently used for the purpose of preventing pollution.
In the year 1916 the assessors of said town of North Salem assessed the relator’s property as follows:
Section 1, block 100, lot 6T, buildings, dam and land,
631.87 acres................................... $544,010
Section 1, block 100, lot 4T, land under water and
above, 413.57 acres............................ 355,990
Section 1, block 100, village and farm land, 364 acres.. 142,130
Total..................................... $1,042,130
The Croton river forms the westerly boundary of the town of North Salem. The Titicus river flows into the Croton river at Purdy’s station. The lands of the relator consist of a strip of land running along the easterly side of the Croton river, from the *469 south to the north side of the town, and a parcel of land on both sides of the Titicus river extending from the first-mentioned parcel four or five miles easterly. On this last-mentioned parcel is erected a dam which impounds the water and floods the larger portion of the land.
The relator, in its petition for the writ of certiorari herein, alleges that the assessment of its lands is illegal, excessive and unequal. In the petition it states that the property of the relator is assessed at the sum of $1,042,130, which is more than the fair market value of said property and that the amount of said overvaluation is the sum of $400,000.
An order was made referring the matter to a referee. The referee heard the witnesses presented by both parties, examined the property and made his report. In this report the referee divided the property into parcels, the same as the assessors had done upon their assessment roll. He found the value of lot 6T to be $1,146,283.75, an increase of $602,273.75 over the value of said parcel appearing on the assessment roll. He found the value of lot 4T to be $51,696.25, a decrease of $304,293.75 from the value appearing upon the assessment roll. He found the value of the lot designated “ village and farm land ” to Ipe $129,320, a decrease of $12,810 from, the value appearing upon the assessment roll. He thus found the total value to be $1,327,300. He also found that the ratio of assessed value to actual or market value was seventy-eight per cent, and fixed the correct taxable value at $1,035,294, specifying the value of each parcel upon the same ratio. These facts, briefly stated, seem sufficient to enable one to understand the discussion which is to follow.
The report of the referee was confirmed by the court at Special Term and the findings of fact made by the referee were adopted as the findings of the court, and it is from the order entered thereon that the relator appeals.
The relator urges that the referee and the court have exceeded their jurisdiction in increasing the assessed value of the relator’s property above the value determined by the assessors. The referee increased the assessment or valuation of some of the parcels and it is claimed that in so doing he exceeded his jurisdiction. The relator claims that the property having been divided into parcels, the court is without power in a proceeding of this character to increase the value of any such parcel. The case which most nearly supports the relator’s contention is People ex rel. Kemp R. E. Co. v. O’Donnel (198 N. Y. 48). In that case the relator owned two parcels of land upon which valuable improvements had been greeted — Lot No. 1, known as the Belgravia apartment house, *470 and Lot No. 69, the Buckingham Hotel. In the annual record of the assessed valuation of the real and personal property in the borough of Manhattan for the year 1904 it appeared that these lots had been assessed by the deputy tax commissioners under the direction of the board of taxes and assessments as follows:
Lot No. 1, value of real estate, unimproved......... $400,000
Value of real estate with improvements thereon...... 500,000
Lot No. 69, value of real estate, unimproved........ 1,050,000
Value of real estate with improvements thereon..... 1,600,000
It was stipulated in that proceeding that for the purposes of taxation the property was assessed at only eighty-eight per cent of the actual value. The referee found that the value of the land in parcel No. 1, unimproved, was $475,000 (as against the assessed valuation of $400,000), and that the improvements added $90,000 to its value (while according to the annual record of assessed valuation they added $100,000). He held, however, that the board of taxes and assessments was bound by the valuation of the land unimproved at $400,000 and accordingly reported that the correct valuation of the property should be made up by adding to that sum eighty-eight per cent of the value of the improvements as found by him, to wit, $79,200, making a total of $479,200. The same thing occurred as to the other parcel. The court at Special Term refused to adopt the referee’s conclusions of law and modified his report so as to direct the reduction to eighty-eight per cent,, to be calculated upon the total actual value of each parcel as he found it to be, notwithstanding the fact that this method involved an increase above the assessment of the land considered as unimproved. From this modification the relator appealed and the Court of Appeals held that the referee was correct in his holding and that the assessment could not be so increased. It said: “ When he [the taxpayer] takes the assessment into court, asking for a reduction thereof, there is nothing in his action which implies a consent to have the assessment increased or a willingness to litigate that question, nor can the action of the commissioners of taxes and assessments in resisting his application for a reduction reasonably be construed into a notice from them that they will ask for an increase. The petition in the certiorari proceeding alleges that the assessed valuations are erroneous by reason of overvaluation and inequality. The return avers the correctness of the assessments. The petition and return in a case of this kind perform the office of pleadings in an action (People ex rel. Buffalo Burial Park Association v. Stilwell, 190 N. Y. 284); and *471 they presented no issue involving the proposition that the assessed valuations as made were too small. Hence, there could not properly be a finding by the court to that effect.” In this connection it is to be borne in mind here that the total assessment has not been increased. Some of "the items of which it is composed upon the assessment roll have been increased and others reduced, the ultimate result being a small reduction in the assessment, about $7,000. The law under which the assessment involved in the above-mentioned case was made is section 892 of the Greater New York charter (Laws of 1901, chap. 466, as amd. by Laws of 1903, chap. 454) and that required the department of taxes and assessments to place in the annual record of the assessed valuations the valuation of property within the city of New York in the following manner: “ In such books the assessed value of real estate shall be set down in two columns; -in the first column shall be given, opposite each separately assessed parcel of real estate, the sum for which such parcel under ordinary circumstances, would sell if wholly unimproved; and in the second column shall be set down the sum for which the said parcel under ordinary circumstances would sell, with the improvements, if any, thereon.” It will be seen by this that the method of assessment adopted in that case was statutory and that the assessors were obliged to state the value of the real estate unimproved and also its value with the improvements. Thus the taxpayer could ascertain the value placed upon the land, also that placed upon the buildings or other improvements. In this case, however, a different situation is presented. It is not claimed that the assessors were bound by law to make any division of the property of the relator. The assessors were not required to put separate valuations upon any of the parcels of land or upon any of the improvements thereon separate from the land. It further appears that the relator did not think that its land had been legally separated into different parcels so as to make separate assessments. In its petition for the writ of certiorari the relator said: “ That said assessment is erroneous, illegal and unjust by reason of overvaluation in that said assessors have assessed the property of your petitioner upon said assessment roll at the sum of $1,042,130.00, which is more than the fair market value of said property and that the amount of said overvaluation is the sum of $400,000.00.”
Prior to filing the petition for the writ the relator filed a protest with the assessors and in that protest the same general allegation was made. The proceeding, therefore, was brought to test the *472 assessment of $1,042,130 placed upon the relator’s property, the relator claiming that the assessment was too high. The referee, in passing upon the question, has increased the value of some parcels and decreased the value of others which enter into the whole property owned by the relator. "As there is no law which compels the assessors to fix the separate values upon these parcels, the referee was at liberty to change the values as he saw fit if the result was not an increase of the total assessment. The increase and decrease of the valuations made by the referee were merely the process by which he arrived at the total assessment. The referee in his report or the assessors upon the assessment roll might have omitted any separate valuation upon these parcels and merely stated the total valuation. I think the situation here is the same as the assessment of a farm consisting of different fields. The assessors, in fixing the valuation of the farm, may fix a separate value upon each field and place the total assessment upon the assessment roll. If the owner reviews the assessment, asking only that the total assessment be reviewed, it does not matter that the referee fixes different values upon the fields of which the farm is composed provided he does not increase the total. “ The petition and return in a case of this kind perform the office of pleadings in an action.” (People ex rel. Kemp R. E. Co. v. O’Donnel, supra; People ex rel. Buffalo Burial Park Assn. v. Stilwell, 190 N. Y. 284.) Applying that rule to this case, all that the relator sought to review was the total of its assessment. The referee has heard all the testimony, has examined all of the property and has arrived at the conclusion that the relator’s property as a whole is overvalued to the amount of $7,000. As the relator only attacked the assessment as a whole, I think the only issue presented was whether the total of the assessment was erroneous or not. The fact that the referee in the process of determining the total value of the relator’s property valued some of the parcels at a lower figure than the assessors and placed a higher value upon others does not, I think, constitute error, especially under the pleadings involved in this case.
The relator contends that a dam such as the dam involved in this proceeding (Titicus dam) is an essential part of the aqueduct system and necessary to its operation and embraced within the term “ aqueducts,” and, therefore, exempt from taxation under section 480 of the Greater New York charter (Laws of 1901, chap. 466). This section reads as follows: “ The lands heretofore taken or to be taken for storage, reservoirs, or for other constructions necessary for the introduction and maintenance of a sufficient supply of water in the city, or for the purpose of preventing contamination *473 or pollution, shall be assessed and taxed in the counties in which they are or may be located, in the manner prescribed by law, exclusive of the aqueducts. But nothing in this section contained shall prevent the assessors in the county of Nassau from assessing the pumping stations and buildings located in such county.”
It seems to me that the right of the town to assess the dam has been specifically passed upon by the Court of Appeals in Matter of City of New York v. Mitchell (183 N. Y. 245). In his recital of facts at the beginning of his opinion in that case Judge Gray said: “ This property consisted of tracts of land, which had been acquired by the city, in the past, for the construction of reservoirs and for the protection of the city’s water supply. The return of the assessors to the writ showed what properties had been the subjects of -their assessment, the various facts upon which their determination had been reached and their procedure. It appeared that, for the first time, they had included in the assessment the various constructions placed upon the land by the city, in connection with the water works system, and the increase based thereupon constituted the grievance of the city and, though other questions were raised, relating to overvaluation and to inequality, it presents the only question, which we shall consider.” The learned judge then cites the various acts in relation to the assessment of these;properties and shows that for a time the Legislature had exemp ted from taxation the aqueduct and the construction works necessary for its purposes but that by section 480 of the Greater New York charter (Laws of 1897, chap. 378, as amd. by Laws of 1900, chap. 463), as amended by chapter 466 of the Laws of 1901, only the aqueduct itself was exempt and it was, therefore, held that these structures other than the aqueduct were taxable. That this is the "decision of the court is made manifest by the concurring memorandum of Judge Edward T. Bartlett, who said: “ I agree, as this decision is in accordance with the letter of the statute. Justice requires that the land should be assessed where situated; not only the aqueduct but its appurtenances should be exempt. The Legislature ought to amend the statute in the interest of the city of New York, as it is engaged in a work of great public necessity.” (See, also, Matter of City of New York v. Allen, 106 App. Div. 262.) The other cases cited by the appellant in no way detract from the value of this case as an authority. I think the assessors were entitled to assess the dam.
The relator claims that even if the dam is assessable a wrong method of valuation has been adopted. -It concedes that the dam cannot be assessed as a part of the city’s water system and its value fixed as an integral part of that system; that the value of the *474 dam to the city is not the test of its value for the purposes of taxation and that the proper measure of its value for purposes of taxation is the cost of reproduction. (People ex rel. D., L. & W. R. R. Co. v. Clapp, 152 N. Y. 490.) The respondents also claim that this is the correct method of determining the value of this dam. The parties, however, differ in the application of this rule. The claim of the appellant is that what is known as the straight Une method of computing depreciation" in value should be applied to this dam. It claims that the usablé life of such a dam is seventy-five years and that it must be assumed that the dam depreciates one-seventy-fifth of its full value each year and that amount should be deducted from its valuation each year. The theory of the assessors is that this property should be assessed the same as any other property, that is, its cost to reproduce should be ascertained at the time of the assessment and from that cost of reproduction should be deducted the amount of any actual physical depreciation. I am inclined to the belief that the theory of the assessors is the correct one. The rule contended for by the relator does not contemplate the disintegration and destruction of the dam at the end of seventy-five years, but it is contended that the growth of the city and consequent necessity for larger reservoirs has shown that dams are not used for the full period during which they are capable of performing their functions. It is further claimed that structures of this character are liable to be destroyed by the elements and that this should be taken into consideration. All of these elements are applicable to the ordinary building. An owner may desire a larger house or store, or his house may be in danger of being struck by hghtning or destroyed by a cyclone, but its value for the purposes of taxation is not affected thereby. I can see no reason for applying any different rule to this property because of its peculiar character. The rule contended for by the appellant, if applied to this property, might lead to strange results. If the dam actually lasted more than seventy-five years, after the lapse of that time, under the rule contended for by the appellant — although still in usable condition — it could not- be taxed, as, theoretically, its taxable life, would have expired. If the town is obliged to reduce the value of the dam one-seventy-fifth each year no matter whether it has depreciated or not, it seems to me it would be equitable to permit only such reduction, although the dam had depreciated more than that amount in one year. Therefore, if the dam had been seriously injured or destroyed, taxation could continue upon the basis of the straight line reduction. I think both of these suggestions show that the straight line method of computing the value of the property *475 is not applicable to property of this character for the purposes of taxation. The city has been asking for the adoption of a rule for the assessment of these properties for a long time and, I imagine, for this same rule. In Matter of City of New York v. Allen (supra) Mr. Justice Keogh said: “ Counsel to the corporation requests that the court set out a rule for the guidance of the assessors in the performance of their official duty. This is neither practicable nor necessary. The unique character of the property to be assessed and its great value make the rule governing its assessment no different from that governing the assessment of other property. The assessors should of course assess each parcel, keeping in mind the extent and nature of the constructions upon it, its relation to the water system of New York city in its entirety, its situation, the uses to which it is put, the approximate cost of reproduction, and then put upon it such a conservative and just value as in their judgment and conscience it warrants, and which will be in keeping with the valuations of other property on the same assessment roll.”
This, as I understand, is the rule adopted by the assessors in assessing this property. They have ascertained the cost of its reproduction (People ex rel. D., L. & W. R. R. Co. v. Clapp, supra) and from the cost of reproduction they have deducted the amount of its physical deterioration. The result is an assessment along the general lines upon which all other property is assessed.
The next contention of the appellant is that if the dam is assessed, the land flooded by the impounded water is valueless and can be assessed only at a nominal value. This property could be assessed upon two theories: c(a) Its value as a part of a great water works system; (b) the cost of reproduction. The first theory was that adopted by the assessors in People ex rel. D., L. & W. R. R. Co. v. Clapp (supra), which the Court of Appeals condemned. It pointed out that the second theory was the correct theory. This is the theory so clearly and succinctly set forth by Mr. Justice Keogh. The appellant, it seems to me, does not want to adopt either theory in its entirety. It wants to adopt the reproductive theory in so far as it applies to the dam but not as to the land. It contends that the use to which the land is put renders it valueless and that as long as the land is thus used the assessment should be nominal. The same contention might be made in relation to the land in a railroad right of way, but I think the land under those circumstances is valued at what it would cost to procure it at that time, and the reproductive theory of assessment requires that the value of the land should be fixed in accordance with the value of other land in the immediate vicinity used for ordinary purposes. The land in a railroad right of way in a hilly country *476 is composed of alternate cuts and fills or embankments. The engineer in laying out the road endeavors to have the cuts furnish the material for the fills. The consequence is that it is worthless except for railroad purposes. It is not, however, so valued for the purposes of taxation. Its value is fixed by taking as the primary unit the value of the land as if it were then being condemned. To tins are added the engineering costs, the grading, etc. This is the method the assessors have followed in assessing this land. Notwithstanding that it is now flooded by the waters of the reservoir, they have assessed it at the value it would have in its natural condition at the date of the assessment. This, I think, was the purpose of the Legislature in making “ the lands heretofore taken or to be taken for storage, reservoirs ” taxable in the counties in which they are located. (Greater New York Charter, § 480, supra.) It was seen that the necessities of the city would require it to go into some of the towns of the State and take much of their most valuable land. This would have left the balance of the land to bear all the burdens of the town and county government, the maintenance of highways, and other expenses. This, apparently, the Legislature thought would be inequitable and it, therefore, made provision for the taxation of the land so taken in the localities where situated. Having thus provided for the taxation of these lands, we must assume it was not the purpose of the Legislature to accomplish by indirection the exemption of this land from taxation. This, however, would be the result if the relator’s theory was sustained and the land held to be only of nominal value. * Although taxable under the law, no benefit would accrue to the community because it could only be assessed for a nominal amount. This theory, I think, cannot be sustained.
The appellant urges a number of other alleged errors. Most of them, however, are questions of fact and the referee had before him testimony which justified the findings arrived at by him and we see no reason to disturb his findings upon those matters, especially as he had the opportunity of viewing the premises — not only the premises assessed, but all the other parcels cited by the parties to sustain their theories as to whether the property in question was assessed at a higher rate than other premises of a like character in the same town.
There remains for consideration but one further question and that is the allowance of costs. The Special Term awarded costs to the respondents and also granted an extra allowance. The assessment, as has been stated above, wras reduced about $7,000. Under the law in effect at the time the order appealed from was *477 made (Tax Law, § 294, as amd. by Laws of 1920, chap. 649), the court was not authorized to award costs or to grant an allowance to the respondents. Costs could be granted to them only in the event of the writ being quashed or the assessment confirmed.
I recommend that the final order be modified by striking therefrom the costs, disbursements and allowance awarded to the assessors, and as modified affirmed, without costs.
Kelly, P. J., and Young, J., concur; Kapper, J., dissents and reads for reversal.